JUDGE SWAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HUNTER'S MOON FARM, LLC,

                              Plaintiff,

          -against-

FRANK MADDEN SHOW STABLE, LLC,
and FRANK I. MADDEN,

                            Defendants.

Case No. _____

**COMPLAINT**

RECEIVED
JUN 21 2011
U.S.D.C. S.D. N.Y.
CASHIERS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Hunter's Moon Farm, LLC ("HMF"), by its attorneys Kasowitz, Benson, Torres & Friedman LLP, hereby alleges as follows:

## INTRODUCTION

In substance, this is a dispute in the sports-law area concerning a sought-after horse trainer who, mid contract, decided to disavow his contract with his team, an equestrian training stable, and go work for the competition. Just like Derek Jeter cannot one day decide to leave the Yankees to go play shortstop for the Red Sox when he has an extant contract, Defendant Frank Madden cannot decide mid-stream in his professional contract to go work for a competing farm.

## THE PARTIES

1.     Plaintiff HMF is a New York limited liability company with its principal place of business in New York, New York. Each of the constituent members of HMF is a citizen of New York, New York only.

2.     Upon information and belief, Defendant Frank Madden Show Stable, LLC ("FMSS") is a New Jersey limited liability company with its principal place of business in

Somerville, New Jersey. Upon information and belief, Frank Madden Show Sable, LLC's sole member is Defendant Frank I. Madden.

3. Upon information and belief, Defendant Frank I. Madden is a natural person and a domiciliary of New Jersey who maintains his domicile in Colts Neck, New Jersey.

4. Upon information and belief, FMSS has no noteworthy assets or business purpose of its own. Madden, the incorporator, sole member and officer of FMSS, uses FMSS as an instrumentality for his professional activities as an equestrian trainer solely to veil himself from liability for his wrongful conduct and questionable business practices with individuals or entities with whom he engages in contractual relationships on behalf of FMSS, including HMF. Madden directs all actions of FMSS, including the actions at issue in this lawsuit, and Madden so dominates and controls FMSS that for all practical purposes, FMSS and Madden are one and the same.

## JURISDICTION & VENUE

5. This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1332, insofar as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. This Court has personal jurisdiction over Defendants and venue is properly placed in this Court pursuant to 28 U.S.C. § 1391(a) because, in Section 28 of the Equine Facility and Services Agreement at issue, FMSS irrevocably consented to the exclusive jurisdiction of courts sitting in Manhattan for any legal action arising out of such agreement. FMSS' consent to jurisdiction also gives this Court personal jurisdiction over Defendant Madden, the sole member and officer of FMSS, because Madden utilizes FMSS as his alter ego. As the alter ego of FMSS, Madden is subject to the forum selection clause of the Equine Facility and Services Agreement.

Regardless, Madden now engages in business in New York by training riders at another

competing farm located in New York, the claims in this case arise out of such conduct, and thus,

Madden has sufficient contacts with the forum state that the exercise of jurisdiction over his

person is proper, separate and apart from the contractual forum selection clause to which he is

bound.

## FACTUAL ALLEGATIONS

7.     HMF leases and operates an equestrian training facility located at 6080 Northern

Boulevard, East Norwich, New York ("Hunter's Moon Farm").  Conveniently situated in Nassau

County between Manhattan and the Hamptons, Hunter's Moon Farm opened in 2006 to train and

provide opportunities for those competitive riders who are part of Long Island's equestrian

community, among others.

8.     On or about March 21, 2008, HMF, FMSS and Madden entered into an Equine

Facility and Services Agreement (the "Professional Services Agreement").  Madden signed the

Professional Services Agreement for FMSS as its sole member.

9.     The Professional Services Agreement provides that HMF would enter into

separate equine management contracts with riders who would board their horses at Hunter's

Moon Farm.  HMF would provide board and care and other related services for the riders'

horses, and Madden would train the horses and riders, among other things (including buying,

selling and leasing horses for riders, selling them gear, etc.).  On a weekly basis, FMSS and

Madden would provide an itemization of charges for services it had provided to the riders and

their horses.  HMF then would use this information to bill the riders directly, and collect the

amounts due.  FMSS and Madden would receive a percentage of the revenue generated from

these activities, with the percentage varying based on the activity and other factors.

10.     HMF entered into the Professional Services Agreement, as does the owner of any competitive sporting enterprise, to secure the services of talented personnel. In this case, HMF secured the exclusive services of Madden, who was a sought-after trainer known in the equestrian community for his specialization in training and developing young equitation and show jumping talent. Several of Madden's top riders have represented the United States at the highest levels of national competition, have earned coveted awards at such shows as the Washington International and the Devon Horse Shows, and have been winning top honors in all of this country's major finals and championships year after year. As noted on his website, Madden's contribution to the sport has been recognized in various awards and honors such as the prestigious "Developmental Coach of the Year" award from the United States Olympic Committee. Madden and several of his riders were also featured in the 2005 Animal Planet television series "Horse Power: The Road to the Maclay."

11.     With Madden as the face of Hunter's Moon Farm, HMF was planning to develop a steady client base and turn Hunter's Moon Farm into a nationally recognized and highly competitive equestrian training program and facility. Indeed, between 2008 and 2010, HMF and FMSS entered into forty two Equine Management Agreements for a range of seventy six to eighty four horses, not including outside clients who generated much income for HMF and occasionally rented space at Hunter's Moon Farm. Also between 2008 and 2010 HMF made approximately $2 million in capital improvements to Hunter's Moon Farm in accordance with Section 13.1 of the Professional Services Agreement, which improvements were paid for by Carnelian Farms LLC, the owner of Hunter's Moon Farm whose constituent members are the same as HMF's. HMF made such upgrades so as to render Hunter's Moon Farm attractive to the kind of clientele Madden was bringing in. HMF made these investments in detrimental reliance

-4-

on Madden's adherence to the Professional Services Agreement, and would not have made such

major investments in a time of economic downturn had it known that Madden would disavow his

contractual obligations mid contract.

12.    As soon as the Professional Services Agreement had been executed, Madden

joined Hunter's Moon Farm as head trainer, setting up shop on site. With him, Madden brought

his team of assistant trainers.

13.    Madden was such an important player on Hunter's Moon Farm's team that

Section 16.6 of the Professional Services Agreement provides that HMF may obtain key man

insurance for Madden and in such event requires FMSS to cooperate in obtaining such insurance.

14.    To ensure the exclusivity of Madden's services, which is something necessary for

virtually all competitive sporting endeavors, Section 10.4 of the Professional Services

Agreement provides as follows:

> **10. 4. Exclusivity.** During the term of this Agreement, FMSS agrees that it shall
> not perform training or related services at any other facility; provided, however,
> that FMSS may perform such services in connection with competitions and clinics
> that take place outside of the Facility.

15.    The purpose of the carve-out referenced in the "provided, however" clause

permits Madden to coach Hunter's Moon Farm riders when they compete at facilities and shows

located elsewhere, something that was necessary to allow Madden to perform his role as trainer

and coach of Hunter's Moon Farm riders. Indeed, as to "clinics" (separate from "competitions")

the Professional Services Agreement is more restrictive:

> **3.9.2. Outside Clinics.** FMSS shall not conduct or participate as an instructor or
> trainer in more than six Outside Clinics in any twelve-month period unless FMSS
> and HMF agree otherwise in writing. An 'Outside Clinic' shall be defined as a
> clinic not taking place at the Facility.

16.     The Professional Services Agreement's advertising provision is similarly designed to ensure the exclusivity of the relationship:

> **9. Advertising.** […]  Neither party shall place an advertisement or otherwise engage in marketing unless such action is included in the marketing plan or the party receives prior written consent of the other party.  All advertising and marketing collateral shall contain the name and logo of each party.

17.     FMSS and Madden violated these provisions in a number of ways.  First, Madden worked with and assisted two clients (Bausano and Melwani) in moving their six horses from Hunter's Moon Farm's to a competitor farm in Wellington, Florida during the 2010 winter season, and proceeded to provide his training services there.  That is, Madden worked for a competitor farm while he was under contract with Hunter's Moon Farm.  The timing of this breach was particularly inopportune, as HMF, at Madden's behest ironically enough, had just leased a premium property in Wellington, Florida, in close proximity of the Winter Equestrian Festival show grounds for the purpose of providing stabling and training facilities to Hunter's Moon Farm clients choosing to winter their horses in Florida.  After reviewing all the options together with Madden, HMF secured the Lindner Farm, a facility that provided all amenities Madden insisted on, with the explicit understanding that all of Hunter's Moon Farm's clients attending the Winter Equestrian Festival would stable their horses at the Lindner Farm, and Madden would train there full-time.

18.     The departure of these two clients' six horses caused HMF to lose substantial revenues, much of which were necessary to cover HMF's fixed costs for the winter season. What is more, these financial losses were difficult to mitigate, as the Lindner Farm lease specifically prohibited subletting any portion of the premises, and HMF was not able to completely fill these occupancies.

19.     HMF demanded that Madden cease luring clients away and provide his training

services solely to clients boarding their horses at the Lindner Farm.  Madden refused and instead

continued training competitors' riders at a competitor facility, and publicly displayed his logo at

horse shows alongside that of Sleepy P. Ranch, a competitor training facility and stable.  Madden

also did not return to Hunter's Moon Farm at the end of the winter season.  Instead, on April 13,

2011 FMSS and Madden purported to terminate the Professional Services Agreement, even

though FMSS and Madden had no right to do so.

20.     The termination letter was nothing but a sham designed to paper over FMSS' and

Madden's most glaring breach of the Professional Services Agreement.  Prior to his purported

termination of the Professional Services Agreement, Madden already had agreed to join a

competing stable, Old Salem Farm in Westchester County, New York.

21.     Madden lured away from Hunter's Moon Farm a group of clients (Bausano,

Cohen, Comunale, Hero, Hoffman, Morgello, Melwani, Pressman, Reynolds), who terminated

their Equine Management Agreements and followed Madden to Old Salem with their fifteen

horses.

22.     Madden also continues to train one other Hunter's Moon Farm client, the Strauss

family, who now board their eight horses at other facilities but would have returned to Hunter's

Moon Farm if Madden were still the head trainer there.

23.     These losses exacerbate the losses HMF already had experienced in the year

leading up to this case, all of which were due to Madden's and FMSS' breaches.  Seven mutual

clients and their up to sixteen horses left Hunter's Moon Farm for other facilities due to various

forms of unprofessional conduct on the part of Madden and his team of assistant trainers.  Such

conduct included Madden's protracted absences, due in part to his participation in a large

number of outside clinics (more than the permitted number); his website alone lists nine clinics for 2010 when only six were permitted under the Professional Services Agreement.

24.     To add insult to injury, upon information and belief one of Madden's assistant trainers posted a comment on a social networking website commenting that Hunter's Moon Farm would now be empty for a long time.

25.     As a result of these actions, HMF has lost nearly two thirds of its riders, horses, and business.

### FIRST CLAIM FOR RELIEF
### (Permanent Injunction)

26.     HMF incorporates paragraphs 1 through 25 of the Complaint as if fully set forth herein.

27.     HMF entered into the Professional Services Agreement with FMSS and Madden for one simple reason: to bring on board the training talent and marketing cachet of Madden, a top ranking trainer known within the sport for his specialization in developing junior talent. Madden was a key asset to Hunter's Moon Farm, and a key to HMF maintaining its competitive advantage and thus a viable business. To that end, and with limited exceptions, the Professional Services Agreement's exclusivity provision prohibits FMSS and Madden from performing training and other related services at any facility other than Hunter's Moon Farm during the term of the Professional Services Agreement.

28.     FMSS and Madden violated this provision, among others, because Madden worked for a competitor stable, he lured clients to competitor stables, he trained non-Hunter's Moon Farm riders, and he exceeded the number of permitted outside clinics in 2010. Madden's defection to competitor Old Salem Farm in March 2011, a full month prior to his ineffective, but

purported, termination of the Professional Services Agreement, however, constitutes the most flagrant of violations of the exclusive Professional Services Agreement. As if that was not enough, FMSS and Madden solicited Hunter's Moon Farm clients, who terminated their agreements with HMF to join Madden at his new training facility or use his training services elsewhere.

29.    FMSS and Madden have and will continue to provide training services at other facilities, including those on Long Island, luring current riders and horses of Hunter's Moon Farm and impairing Hunter's Moon Farm's ability to draw prospective riders and clients.

30.    By reason of the foregoing, HMF has been and continues to be irreparably harmed and has no adequate remedy at law. Every day Madden trains at a competitor's stable, HMF loses significant competitive advantage in the sport. As a direct result, HMF's business is being injured, as it has lost a substantial portion of its riders, horses and client base, it is in danger of losing additional clients or not being able to attract prospective clients, and other harm, all of which cannot be adequately remedied by money damages because of the nature of the sport (riders seek to train with specific trainers), and money will not return the competitive advantage in the sport Hunter's Moon Farm once had.

31.    By reason of the foregoing, HMF is entitled to an injunction restraining FMSS and Madden from training or working for any stable that is a competitor to Hunter's Moon Farm during the duration of the Professional Services Agreement.

32.    Because Madden is the alter ego of FMSS and grounds exist to pierce the corporate veil as between FMSS and Madden, to the extent necessary to do so, the Court should enjoin Madden for that reason also.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

33.     HMF incorporates paragraphs 1 through 32 of the Complaint as if fully set forth herein.

34.     The Professional Services Agreement is a valid, binding and enforceable contract.

35.     HMF has performed all of its obligations under the Professional Services Agreement, and is not in breach of any provision thereof.

36.     FMSS has breached the Professional Services Agreement by, among others, violating the exclusivity provision in that Madden, FMSS' principal and sole member, trained non-Hunter's Moon Farm riders at competitor stables, lured clients to board horses at competitor stables, exceeded the number of permitted outside clinics, and repudiated the Professional Services Agreement so as to accept a position as trainer at a competitor stable, Old Salem Farm.

37.     FMSS also breached the Professional Services Agreement by, among others, violating the advertising provision in that Madden, its principal and sole member, publicly marketed himself on his website without reference to Hunter's Moon Farm, publicly displayed his logo on saddle pads alongside that of competing stables, and allowed Old Salem Farm to advertise him as a trainer on its website.

38.     FMSS also has breached the Professional Services Agreement by, among others, failing to provide HMF with an itemized list of charges for services rendered by Madden and his team, including billing for commissions, training and lessons.

39.     FMSS also has breached the Professional Services Agreement by, among others, Madden and his team failing to conduct themselves in a professional manner, including, but not limited to, Madden's protracted absences from Hunter's Moon Farm, his failure to hire, train and

properly supervise assistant trainers, his failure to address an assistant trainer's romantic involvements with two separate clients, his employment of a client as an assistant trainer despite lack of qualifications and experience, his indiscreet personal relationship with an assistant trainer, and his refusal to listen to or address client complaints.

40.     FMSS' actions and inactions have resulted in HMF losing nearly two thirds of its client base.

41.     As a direct result of FMSS' wrongdoing, HMF has been damaged in an amount to be determined at trial, but which cannot fully be compensated by money alone.

42.     Because Madden is the alter ego of FMSS and grounds exist to pierce the corporate veil as between FMSS and Madden, Madden is personally liable for FMSS' breaches of the Professional Services Agreement, including all damages for which FMSS is liable.

THIRD CLAIM FOR RELIEF
(Breach Of The Implied Covenant Of Good Faith And Fair Dealing)

43.     HMF incorporates paragraphs 1 through 42 of the Complaint as if fully set forth herein.

44.     The Professional Services Agreement is a valid, binding and enforceable contract.

45.     HMF has performed all of its obligations under the Professional Services Agreement, and is not in breach of any provision thereof.

46.     The Professional Services Agreement includes an implied covenant of good faith and fair dealing.

47.     In additional to its material breaches of the Professional Services Agreement, FMSS consciously corrupted HMF's relationship with riders at Hunter's Moon Farm, and solicited clients away from Hunter's Moon Farm both prior and subsequent to FMSS' purported

but ineffective termination of the Professional Services Agreement, thus causing HMF to lose nearly two thirds of its business.

48.     In doing so, FMSS has breached the Professional Services Agreement's underlying pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

49.     As a direct result of FMSS' wrongdoing, HMF has been damaged in an amount to be determined at trial, but which cannot fully be compensated by money alone.

50.     Because Madden is the alter ego of FMSS and grounds exist to pierce the corporate veil as between FMSS and Madden, Madden is personally liable for FMSS' obligations under the Professional Services Agreement, including all damages for which FMSS is liable.

## FOURTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty and Duty of Loyalty)

51.     HMF incorporates paragraphs 1 through 50 of the Complaint as if fully set forth herein.

52.     As a result of the Professional Services Agreement, a relationship of trust and confidence was created between HMF on the one hand, and Madden on the other.

53.     Indeed, the special relationship between Madden and HMF was acknowledged in Section 10.3 of the Professional Services Agreement, pursuant to which Madden was pledged to conduct himself in a professional, ethical and honest manner considering that his behavior reflected upon HMF and its reputation.  Likewise, Madden was responsible for all training and related activities at Hunter's Moon Farm, he had great discretion in running the training aspect of the stable, and HMF was at Madden's mercy in terms of interacting with riders and clients.

54.    At all relevant times hereto, Madden owed fiduciary duties to HMF.

55.    Madden breached his fiduciary duties to HMF by, among other things, luring the above-referenced clients away from Hunter's Moon Farm to other competing facilities so as to benefit and enrich Madden.

56.    As a direct result of Madden's wrongdoing, HMF has been damaged in an amount to be determined at trial, but which cannot fully be compensated by money alone.

FIFTH CLAIM FOR RELIEF
(Tortious Interference With Prospective Economic Advantage)

57.    HMF incorporates paragraphs 1 through 56 of the Complaint as if fully set forth herein.

58.    Clients Bausano, Cohen, Comunale, Hero, Hoffman, Morgello, Melwani, Pressman, Reynolds had boarded their horses at Hunter's Moon Farm since as early as November 2008.

59.    FMSS and Madden intentionally interfered with HMF's business relationship with these clients by dishonest, unfair and improper means. Among others, Madden abused his position of trust and confidence at Hunter's Moon Farm as its head trainer to solicit and lure the above-referenced clients away from Hunter's Moon Farm to other competing facilities so as to benefit and enrich Madden and FMSS.

60.    As a direct result of FMSS' and Madden's interference, HMF has been damaged in an amount to be determined at trial, but which cannot fully be compensated by money alone.

## SIXTH CLAIM FOR RELIEF
(Attorney's Fees)

61.     HMF incorporates paragraphs 1 through 60 of the Complaint as if fully set forth herein.

62.     HMF incurred and continues to incur attorneys' fees and costs in association with this action.

63.     Pursuant to Section 29 of the Professional Services Agreement, HMF is entitled to an award of all attorneys' fees and costs incurred in this action.

64.     Because Madden is the alter ego of FMSS and grounds exist to pierce the corporate veil as between FMSS and Madden, Madden personally is liable for FMSS' obligations under the Professional Services Agreement, including payment of attorneys' fees and costs for which FMSS is liable under Section 29 of the Professional Services Agreement.

## REQUEST FOR RELIEF

WHEREFORE, HMF demands judgment as follows:

A.     An order preliminarily and permanently enjoining FMSS and Madden from providing any equestrian services, including but not limited to training, boarding or coaching, to any riders other than those who are clients of Hunter's Moon Farm for the duration of the Professional Services Agreement, which runs through and including April 14, 2014;

B.     Damages as against FMSS and Madden in an amount to determined at trial, but in no event less than $1,000,000;

C.     An award of attorneys' fees and costs incurred in connection with this action; and

D.     Awarding HMF such other and further relief as this Court deems just and proper.

Dated: New York, New York
      June 21, 2011

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP

By:_____
    Daniel P. Goldberg (dgoldberg@kasowitz.com)
    Dorit Ungar (dungar@kasowitz.com)
    Eileen Monaghan DeLucia (edelucia@kasowitz.com)

1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiff*